LILLIAS BERZITO, PLAINTIFF-APPELLANT, v.
VINCENT GAMBINO, DEFENDANT-RESPONDENT.

Argued February 21, 1973—Decided July 26, 1973.

462

*Mr. Nicholas J. Schuldt* argued the cause for appellant (*Mr. David Einhorn,* Union County Legal Services Corporation, attorney; *Mr. Schuldt,* of counsel; *Mr. Einhorn,* on the brief).

*Mr. Joseph J. Triarsi* argued the cause for respondent (*Messrs. Pisano and Triarsi,* attorneys; *Mr. Triarsi,* of counsel).

*Mr. Richard E. Blumberg,* Newark-Essex Joint Law Reform Project, argued the cause on the brief for *Amicus Curiae,* New Jersey Tenants Organization.

The opinion of the Court was delivered by

MOUNTAIN, J. This case arises as the result of a dispute between a landlord and a tenant. It presents issues not previously passed upon by this Court.

The relief sought by the plaintiff-tenant was substantially granted by the Union County District Court, 114 *N. J. Super.* 124 (1971), but that decision was reversed by the Appellate Division, 119 *N. J. Super.* 332 (1972). We granted certification 62 *N. J.* 67 (1972).

The opinions in the courts below reveal the factual situation, which we will briefly summarize here. In September 1968 the plaintiff rented from the defendant the second-floor, four-room furnished apartment at 608 Montgomery Street in Elizabeth for occupancy for herself and three minor children. There was no written lease; the rental for the apartment was fixed at $35 a week, with all utilities supplied. Plaintiff testified that at the time the terms of the arrangement were agreed upon the apartment was in a deplorable condition but the defendant promised he would make the premises "livable" and agreed to make certain specific repairs. The trial court found that these representations were in fact made, 114 *N. J. Super.* at 129, and the Appellate Division accepted this finding, 119 *N. J. Super.* at 335, as do we.

Testimony was submitted to the trial court that, at the time of the letting, screens and storm windows were either broken or missing, a number of windows were boarded up where the panes had been broken, several radiators were not to be found, there were holes in the floors and wall, plaster was falling, several electric fixtures were inoperable, there was a sewage backup in the cellar and the premises were infested with roaches and rodents. Much of the furniture was found unfit for use and was relegated to the basement. Plaintiff herself replaced the furniture as became necessary. During winter months there was sometimes no heat and at all times insufficient heat.

In addition to concluding that these conditions did in fact exist, the trial court further determined that the efforts of the landlord to correct these inadequacies were feeble and dilatory, and made only when prodded by the court and municipal authorities. 114 *N. J. Super.* 128.

In June 1970 the landlord brought a summary dispossess action against the tenant alleging non-payment of rent. The court found that there had been a breach of the landlord's express warranty of habitability and reduced the rent to

$75 a month retroactive to February 23, 1970, the date from which the tenant had paid no rent. This reduced sum was apparently forthcoming from the tenant at that time, but nothing was paid thereafter and on November 14, 1970 the tenant quit the premises.

In the present action plaintiff seeks to recover the difference between the rent actually paid and an amount calculated at the rate of $75 a month for the period from the commencement of the tenancy until February 23, 1970, pointing out that the landlord's default had continued throughout the entire term. The landlord counterclaimed for the rent remitted by the court. The trial judge determined that the landlord should fairly have been given one month from the date of the inception of the letting within which to undertake and complete the promised repairs. He rejected the defendant's contention that plaintiff had waived the failure to repair by continuing in possession and making full payment of the rent, pointing to the scarcity in the Elizabeth area of available housing for low-income families with children. The plaintiff had given testimony to the same effect. He further concluded that since the repairs had never been adequately made, plaintiff was in fact entitled to the relief sought. Calculating the fair rental value at $75 a month, the landlord would have received a total of $1,200 for the period from November 1968 through February 1970. Since he had in fact received $2,380 during this period, it was determined that he should now return $1,180 and judgment for this amount was entered in the plaintiff's favor. 114 N. J. Super. at 130. The judgment was subsequently reduced to $973.75 to reflect a credit in defendant's favor of $206.25 as rent for the period from August 27, the time of judgment, to November 14, 1970. 119 N. J. Super. at 333.

The Appellate Divison found that some of the defects might properly be classified as "amenities," that the tenant could have quit the premises had she wished but that she made no real effort to find other accommodations. It concluded that the diminution in rent which had been granted.

the tenant in the dispossess proceedings had achieved substantial justice between the parties and accordingly reversed the trial court judgment in plaintiff's favor.

We first consider the applicable law in this State. In *Reste Realty Corporation v. Cooper,* 53 *N. J.* 444 (1969) the lessor brought suit against the lessee for unpaid rent. The evidence disclosed that the demised premises — the basement floor of a commercial building — were periodically flooded with rain water due to the improper surfacing of an adjoining driveway. Following many complaints and after it had become apparent that the recurrent floodings rendered the property substantially useless for the lessee's intended purpose, she quit the premises and refused to make any further rental payments. This Court, reversing the Appellate Division, reinstated the judgment of the trial court in favor of the lessee. The failure of the landlord to remove the cause of the flooding was found to be a violation of the covenant of quiet enjoyment contained in the lease, thus constituting a constructive eviction justifying the action of the tenant in vacating the demised premises. During the course of the Court's opinion it was pointed out that historically a lease for a term of years carried with it no implied warranty of habitability or of fitness for the agreed purpose of the tenancy, that the doctrine of *caveat emptor* applied and that in the absence of an express covenant to repair or proven misrepresentation the tenant took the property "as is." 53 *N. J.* at 451. It was noted nevertheless that these doctrines were being widely and forcefully attacked as inadequate to meet modern conditions, and it was stated, by way of considered *dictum,* that

. . . present day demands of fair treatment for tenants with respect to latent defects remediable by the landlord, either within the demised premises or outside the demised premises, require imposition on him of an implied warranty against such defects. [53 *N. J.* at 454]

*Reste* is probably more important for what the opinion said and for what it forecast than for what it held. The doctrine

of constructive eviction, upon which the decision in the
tenant's favor rested, was by no means novel, 1 *American
Law of Property* (Casner ed. 1952) § 3.51, and as has often
been pointed out, as a remedy it has serious drawbacks from
a tenant's point of view. If the conduct of a landlord is
later found by a court not to have justified the tenant in
vacating the premises, he will remain liable for unpaid rent.
Furthermore he may be unable to find other quarters that
he can afford and that he wishes to rent and in any event
he will be saddled with the not inconsiderable expenses of
moving.

The decision of this Court in *Marini v. Ireland,* 56 *N. J.*
130 (1970) went much further toward improving a tenant's
position vis-a-vis a recalcitrant landlord. That action origi-
nated as a summary dispossess proceeding. We there held,
*inter alia,* that a residential lease carries with it an implied
warranty or covenant of habitability. In explaining this hold-
ing Justice Haneman said,

> Actually it is a covenant that at the inception of the lease, there
> are no latent defects in facilities vital to the use of the premises
> for residential purposes because of faulty original construction or
> deterioration from age or normal usage. And further it is a covenant
> that these facilities will remain in usable condition during the en-
> tire term of the lease. In performance of this covenant the landlord
> is required to maintain those facilities in a condition which renders
> the property livable. [56 *N. J.* at 144]

Having determined that a continuing covenant of habitability
was to be implied, the Court went on to consider the respec-
tive rights and liabilities to which the covenant gave rise as
between lessor and lessee. In that case a toilet had cracked
and water was leaking onto the bathroom floor. Repeated
attempts to inform the landlord were of no avail. The ten-
ant had the toilet repaired at a cost of $85.72 and sent the
landlord a receipted bill in that amount together with a check
for $9.28. Her monthly rental was $95. We found that this
constituted a payment in full of the rent then due, conclud-
ing that where a vital facility is in need of repair, this work

may be done by the tenant who may then offset the expense against his rental obligation. It was carefully pointed out, however, that the tenant's recourse to this form of self-help must be preceded by timely and adequate notice to the landlord to afford him an opportunity to make the necessary replacement or repair himself. Should the tenant be unable to give such notice after making a reasonable effort to do so, as had there been the case, he might nonetheless go forward with the work of repair.

In the case now before us the tenant did not vacate the premises claiming constructive eviction, nor did she undertake the needed repairs herself and then seek to offset the expense so incurred against her obligation to pay rent. Thus she did not seek either of the particular remedies afforded in *Reste* or in *Marini*. The latter case held, however, as we have just noted, that in any residential lease, be it oral or written, there will be implied a covenant or warranty of habitability for the duration of the term. In this case the warranty happens to have been express, but for present purposes this makes no difference. A lessor becomes liable to a lessee for any breach of this covenant. Such a breach having occurred here, the question we are thus called upon to consider is what remedies are then available to a lessee. Are there remedies other than those granted in *Reste* and *Marini*? Were this an ordinary breach of contract, the most obvious remedy would be to award the tenant damages in an amount equal to the difference betwen the rent actually paid in accordance with the lease agreement and what would have been the fair rental value of the premises in their defective condition. The objection is made that, should we adopt this rule, it would drastically change the law, since traditionally most covenants in a lease — as opposed to those in an ordinary contract — are treated as being independent of one another so that while a tenant may have an action for damages against his landlord for the breach of the latter's express or implied covenant to repair, this right of the tenant in no

way lessens his own obligation to make full and punctual payment of rent to the landlord.

This doctrine of independent covenants in leasehold arrangements is probably the most important single consequence of the traditional insistence of the law that because a lease may be said to convey an interest in property, most incidents of the landlord-tenant relationship are to be derived from principles drawn from the law of real property rather than from those to be found in the law of contracts. It has been persuasively argued that while the doctrine of independent covenants, and the strict application of the rule of *caveat emptor* historically so typical of leasing arrangements, may have resulted in fulfilling the reasonable needs and expectations of landlords and tenants in the agrarian society of medieval England, this is no longer true in modern urban and suburban society. Today the tenant needs and expects more than the mere land itself. He generally needs and expects adequate shelter, heat, light, water, sanitation and maintenance. It is obviously unsatisfactory to tell him that he may sue his landlord for any failure to supply these necessities, but that at the same time he must make recurring rental payments as they fall due. *Marini* allowed the tenant, in effect, to apply rent monies to the making of necessary repairs. This was a clear departure from the traditional rule of independent covenants. But the opinion did go on to say that

[t]he tenant has only the alternative remedies of making the repairs or removing from the premises upon such a constructive eviction. [56 *N. J.* at 147]

The defendant here insists that this constituted a holding that no other remedy is available to a tenant, where the landlord is at fault, other than the two that are mentioned. This restrictive reading of *Marini* has been accepted elsewhere as well. See *Restatement of the Law of Property, Second* (Tent. draft No. 1, March 23, 1973) § 5.4, page 213. Admittedly the

sentence, read literally and apart from context, seems to support this position. But of course a casual *dictum* will not shackle the Court to prevent a later exercise of its creative powers in fashioning new remedies as need and occasion demand.

We now hold that the covenant on the part of a tenant to pay rent, and the covenant—whether express or implied—on the part of a landlord to maintain the demised premises in a habitable condition are for all purposes mutually dependent. Accordingly in an action by a landlord for unpaid rent a tenant may plead, by way of defense and set off, a breach by the landlord of his continuing obligation to maintain an adequate standard of habitability.

That such a breach may be availed of by way of defense in a summary dispossess proceeding has already been settled. *Marini v. Ireland, supra,* 56 *N. J.* at 140.

Furthermore a tenant may initiate an action against his landlord to recover either part or all of a deposit paid upon the execution and delivery of the lease or part or all of the rent thereafter paid during the term, where he alleges that the lessor has broken his covenant to maintain the premises in a habitable condition. In such an action, if the alleged breach on the part of the landlord is proven, the tenant will be charged only with the reasonable rental value of the property in its imperfect condition during his period of occupancy. As a prerequisite to maintaining such a suit, the tenant must give the landlord positive and seasonable notice of the alleged defect, must request its correction and must allow the landlord a reasonable period of time to effect the repair or replacement. Not every defect or inconvenience will be deemed to constitute a breach of the covenant of habitability. The condition complained of must be such as truly to render the premises uninhabitable in the eyes of a reasonable person. In *Mease v. Fox, N. W.* 2d 791 (1973) the Supreme Court of Iowa considered the same question that is now before us, in a case involving substantially

identical facts. That opinion set forth the following factors —which we here paraphrase—as meriting consideration in determining whether in fact there has been a breach of the covenant of habitability on the part of the lessor.

1. Has there been a violation of any applicable housing code or building or sanitary regulations?

2. Is the nature of the deficiency or defect such as to affect a vital facility?

3. What is its potential or actual effect upon safety and sanitation?

4. For what length of time has it persisted?

5. What is the age of the structure?

6. What is the amount of the rent?

7. Can the tenant be said to have waived the defect or be estopped to complain?

8. Was the tenant in any way responsible for the defective condition?

This list is intended to be suggestive rather than exhaustive. Each case must be governed by its own facts. The result must be just and fair to the landlord as well as the tenant.

■ The following authorities support the proposition, to which we adhere, that in any residential lease, not only will there be implied on the part of the landlord a covenant of habitability to extend during the term of the demise, but also this covenant and the tenant's covenant to pay rent will be treated as mutually dependent. *Pines v. Perssion,* 14 *Wis.* 2d 590, 111 *N. W.* 2d 409 (1961); *Brown v. Southall Realty Co.,* 237 *A.* 2d 834 (D. C. App. 1968); *Lemle v. Breeden,* 51 *Haw.* 426, 462 *P.* 2d 470 (1969); *Javins v. First National Realty Corp.,* 138 U. S. App. D. C. 369, 428 *F.* 2d 1071 (1970), *cert.* den. 400 *U. S.* 925, 91 *S. Ct.* 186, 27 *L. Ed.* 2d 185 (1970); *Kline v. Burns,* 111 *N. H.* 87, 276 *A.* 2d 248 (1971); *Jack Spring, Inc. v. Little,* 50 *Ill.* 2d 351, 280 *N. E.* 2d 208 (1972); *Hinson v. Delis,* 26 *Cal. App.* 3d 62, 102 *Cal. Rptr.* 661 (1972); *Mease v. Fox, supra,* 200 *N. W.* 2d 791 (Iowa 1972); *Glyco v. Schultz,* 289 *N. E.* 2d 919 (Mun. Ct. Ohio 1972); *Boston Housing Authority v. Hem-*

*ingway, Mass.* 293 *N. E.* 2d 831 (1973); *Restatement of the Law of Property, Second,* (Tent. draft No. 1, March 23, 1973) *supra,* ch. 5.[1] In adopting the foregoing rule these courts deliberately rejected the rule of independent covenants and the doctrine of *caveat emptor* as applying to leases.

Furthermore the rule we espouse is in thorough accord with the prevailing legislative point of view. In 1971 the Legislature enacted a statute designed to meet the problem we are considering. (*L.* 1971, *c.* 224; now *N. J. S. A.* 2A:42–85 *et seq.*)[2] Since it did not become effective until June 21, 1971 it is not directly applicable to this case. But as was recently pointed out by Justice Sullivan, speaking for this Court in *Shell Oil Co. v. Marinello,* 63 *N. J.* 402 (1973) a statute often reflects legislative concern over a longstanding abuse, and to that extent may be fairly understood as articulating a public policy pre-existing the date of the statutory enactment. Such is clearly the case here. The introductory section of this statute is entitled, "Legislative findings," and reads as follows:

The Legislature finds:

a. Many citizens of the State of New Jersey are required to reside in dwelling units which fail to meet minimum standards of safety and sanitation;

b. It is essential to the health, safety and general welfare of the people of the State that owners of substandard dwelling units be

---

[1] A similar approach to this problem was taken in *Academy Spires, Inc. v. Brown,* 111 *N. J. Super.* 477 (Cty. Dist. Ct. 1970) and in *Samuelson v. Quinones,* 119 *N. J. Super.* 338 (App. Div. 1972), noted in 4 *Seton Hall L. Rev.* 714 (1973).

[2] Similar rent withholding statutes exist in a number of other states. The Massachusetts act is discussed in *Boston Housing Authority v. Hemingway, supra,* as are the somewhat similar Housing Regulations of the District of Columbia in *Javins v. First National Realty Corporation, supra.* See also Comment: *The Pennsylvania Project — A Practical Analysis of the Pennsylvania Rent Withholding Act,* 17 *Vill. L. Rev.* 821 (1972) as well as *Statutory Note, Restatement of the Law of Property, Second* (Tent. draft No. 1, March 23, 1973) *supra* at 167–173.

encouraged to provide safe and sanitary housing accommodations for the public to whom such accommodations are offered;

    c. It is necessary, in order to insure the improvements of substandard dwelling units, to authorize the tenants dwelling therein to deposit their rents with a court appointed administrator until such dwelling units satisfy minimum standards of safety and sanitation. [*N. J. S. A.* 2A:42–85]

The act provides that either at the instance of a designated public official (presumably the building inspector) or at the instance of an affected tenant, a petition may be filed with a court of competent jurisdiction that shall

[s]et forth material facts showing that there exists in such dwelling or any housing space thereof one or more of the following: a lack of heat or running water or of light or electricity or of adequate sewage disposal facilities, or any other condition or conditions in substantial violation of the standards of fitness for human habitation established under the State or local housing or health codes or regulations or any other condition dangerous to life, health or safety. [*N. J. S. A.* 2A:42–90(a)]

The petition must also show that the landlord has been apprised of the alleged deficiency and has failed to take corrective steps within a reasonable time. The action shall then proceed in a summary manner. If the landlord is able to show that the alleged condition does not exist, that it has been corrected, that it was caused by the tenant or that the landlord has been denied entry to that portion of the premises to which access must be had in order to correct the condition, then the action will be dismissed. Otherwise, if the proofs are adequate, judgment will be entered directing that rents thenceforth be deposited with the clerk of the court to be used to remedy the improper conditions that have been found to exist. The statute sets forth in detail the procedure to be followed to accomplish the desired result. Any attempt to waive the provisions of the enactment in a lease or other agreement will be void as against public policy. *N. J. S. A.* 2A:42–96. The statute broadly covers "all rental premises or units used for dwelling purposes except owner-occupied

premises with not more than two rental units." *N. J. S. A.*
2A:42–86(d). This act, although not available to the plaintiff in this case, will in the future afford a further remedy, in addition to those we have mentioned above, to tenants of substandard dwellings.

As to the defense of waiver we agree with the trial court's finding to the contrary, which is adequately supported by the proofs. We also find sufficient evidence in the record to sustain the trial court's findings as to the rental value of the apartment.

For the reasons set forth above the judgment of the Appellate Division is reversed and the judgment of the trial court, as amended, in the amount of $973.75 in favor of the plaintiff is herewith reinstated.

*For reversal*—Chief Justice WEINTRAUB, Justices JACOBS, PROCTOR, HALL and MOUNTAIN and Judges CONFORD and SULLIVAN—7.

*For affirmance*—None.